IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| James Wilburn Ford, as the Personal, Representative for the Estate of Mark Alexander Ford, <br><br> Plaintiff, <br><br> v. <br><br> The City of Myrtle Beach, Myrtle Beach Police Department, Ryan Alvarado, Sandy Eveges, Tammy Taylor, Betty Reitzel, John Doe, and Warren Gall, <br><br> Defendants. | C/A No. 9:18-cv-00459-SAL <br><br><br><br><br><br> **OPINION & ORDER** |

This matter is before the court for review of the Report and Recommendation of United States Magistrate Judge Bristow Marchant, made in accordance with 28 U.S.C. § 636(b)(1) and Local Civil Rule 73.02(B)(2) (D.S.C.) (the "Report").

**PROCEDURAL BACKGROUND**

Plaintiff James Ford, as the Personal Representative of the Estate of Mark Alexander Ford ("Plaintiff"), filed this action against Defendants, alleging constitutional violations as well as two state law causes of action. The claims stem from the death of Mr. Mark Alexander Ford ("Mr. Ford") after he was arrested and detained for public intoxication.

Defendants filed a motion for summary judgment on November 25, 2019, Plaintiff filed his response on December 19, 2019, and Defendants filed a reply. [ECF Nos. 42, 46, 47.] On April 23, 2020, the Magistrate Judge issued the Report, recommending that this court grant in part and deny in part Defendants' motion. [ECF No. 52.] More specifically, the Report recommends granting summary judgment on Plaintiff's Second Cause of Action, denying Defendants' motion as to Plaintiff's First, Third, and Fourth Causes of Action, and dismissing Defendant Warren Gall

1

as a party to this case. *Id.* Additionally, with the consent of Plaintiff, the Report recommends dismissing Defendants Ryan Alvarado and Sandy Eveges as parties to this case. *Id.*

Attached to the Report was the notice of right to file objections. Defendants filed objections on May 1, 2020, and Plaintiff filed a response. [ECF Nos. 53, 56.] The matter is ripe for consideration by this court.

## REVIEW OF A MAGISTRATE JUDGE'S REPORT

The Magistrate Judge makes only a recommendation to this court. The recommendation has no presumptive weight, and the responsibility to make a final determination remains with this court. *See Mathews v. Weber*, 423 U.S. 261, 270–71 (1976). The court is charged with making a de novo determination of only those portions of the Report that have been *specifically* objected to, and the court may accept, reject, or modify the Report, in whole or in part. 28 U.S.C. § 636(b)(1). In the absence of objections, the court is not required to provide an explanation for adopting the Report and must "only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 315 (4th Cir. 2005) (citing Fed. R. Civ. P. 72 advisory committee's note).

"An objection is specific if it 'enables the district judge to focus attention on those issues—factual and legal—that are at the heart of the parties' dispute.'" *Dunlap v. TM Trucking of the Carolinas, LLC*, No. 0:15-cv-04009, 2017 WL 6345402, at *5 n.6 (D.S.C. Dec. 12, 2017) (citation omitted). A specific objection "requires more than a reassertion of arguments from the [pleading] or a mere citation to legal authorities." *Sims v. Lewis*, No. 6:17-cv-3344, 2019 WL 1365298, at *2 (D.S.C. Mar. 26, 2019). It must "direct the court to a specific error in the magistrate's proposed findings and recommendations." *Orpiano v. Johnson*, 687 F.2d 44, 47 (4th Cir. 1982). Thus, "[i]n

the absence of *specific* objections . . . this court is not required to give any explanation for adopting the recommendation." *Field v. McMaster*, 663 F. Supp. 2d 449, 451–52 (4th Cir. 2009).

## DISCUSSION

The Report sets forth in detail the relevant facts and standards of law on this matter, and this court incorporates those facts and standards without a recitation.[1]  Each objection, however, is addressed in turn below.

### I. Objections 1 and 2: Deliberate Indifference to Medical Needs.

Defendants object to the Report's conclusion that the evidence presented was sufficient to create a genuine dispute of material fact regarding whether Defendants Betty Reitzel ("Defendant Reitzel") and Tammy Taylor ("Defendant Taylor") knew that a substantial risk of serious harm to Mr. Ford existed, and that they drew that inference.  In reaching its conclusion, the Report points to the fact that "Defendants were aware that Ford was in his cell for several hours basically unable to get off his mat on the floor or to even sit up, that he was observed to be 'gray in color', and that during that period of time he was also 'nonsensical.'"  [ECF No. 52 at p.9.]  Defendants disagree, arguing that "[t]he facts . . . do not show or give rise to an inference that Reitzel and Taylor actually recognized a substantial risk of harm to Ford or that they actually recognized that the actions they took were inappropriate."  [ECF No. 53 at p.5.]  This court declines to adopt the Report as to Defendant Reitzel and adopts the Report as to Defendant Taylor.

Plaintiff seeks to recover against Defendant Reitzel and Defendant Taylor for violations of his constitutional right to adequate and proper medical care.  Because Mr. Ford was a pretrial detainee, Plaintiff's claims are evaluated under the due process clause of the Fourteenth Amendment.  *See*

---

[1] Defendants do not object to the Report's recitation of the facts in the "Background" portion of the Report and, therefore, the undersigned fully adopts that recitation.

3

*Young v. City of Mt. Ranier*, 238 F.3d 567, 575 (4th Cir. 2001). For purposes of determining whether Mr. Ford received constitutionally adequate medical care, the standard is essentially the same as for a claim under the Eighth Amendment.

To succeed on an Eighth Amendment deliberate indifference claim, a plaintiff "must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotation marks omitted). Stated differently, "the Eighth Amendment bars inhumane 'conditions of confinement'—such as depriving an inmate of 'adequate food, clothing, shelter, and medical care.'" *Campbell v. Florian*, No. 19-6417, 2020 WL 5014880, at *5 (4th Cir. Aug. 20, 2020) (citing *Farmer*, 511 U.S. at 832)). The claim has two elements—one objective and one subjective.

First, the "deprivation . . . must be, *objectively*, sufficiently serious; . . . the denial of the minimal civilized measure of life's necessities." *Farmer*, 511 U.S. at 834 (internal quotation marks omitted; emphasis added). The objective prong requires the plaintiff to show that he suffered from a serious medical need, a need "that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). This first element is not in dispute. Mr. Ford was suffering from a serious medical need.

Second, the "prison official must have a sufficiently culpable state of mind"—the subjective element. *Farmer*, 511 U.S. at 834 (internal quotation marks omitted). The subjective prong requires the plaintiff to show that the prison official acted with deliberate indifference. *See id.* at 835–36. "[D]eliberate indifference to a substantial risk of serious harm to a [plaintiff] is the equivalent of recklessly disregarding that risk." *Id.* at 836. In this context, acting recklessly means "a person must consciously disregar[d] a substantial risk of serious harm." *Id.* at 839. While the

4

plaintiff does not have to show that the defendant acted or failed to act "for the very purpose of causing harm or with knowledge that harm will result," he must show "more than mere negligence." *Id.* at 835.

The Fourth Circuit has recognized deliberate indifference as "a very high standard." *Grayson v. Peed*, 195 F.3d 682, 695 (4th Cir. 1999) (citation omitted). It also requires two showings: (1) the prison official subjectively recognized a risk of substantial harm and (2) he subjectively recognized that his actions were inappropriate in light of that risk. *Campbell*, 2020 WL 5014880, at *6 (citing *Anderson v. Kingsley*, 877 F.3d 539, 545 (4th Cir. 2017)) (internal quotation marks omitted). As recognized by the Magistrate Judge, "in order to survive the Defendants' motion for summary judgment, the evidence must be sufficient to create a genuine issue of fact as to whether either named Defendant was deliberately indifferent to Ford's serious medical needs." [ECF No. 52 at p.6.]

Defendants' objections focus on the two subjective requirements of deliberate indifference. [ECF No. 53 at p.5.] Defendants argue that the "facts . . . do not show or give rise to an inference that Reitzel and Taylor actually recognized a substantial risk of harm to Ford or that they actually recognized that the actions they took were inappropriate." *Id.* Defendants point to the following facts:

- Mr. Ford was arrested for public intoxication and was examined by EMTs before he was placed in an observation cell;

- Defendants Reitzel and Taylor, on separate occasions, asked Mr. Ford if he wanted medical attention, and Mr. Ford declined;

- Following his fall in the observation cell, Mr. Ford was examined and no bruises or wounds were found on him;

- Defendant Taylor instructed Mr. Ford to stay on the mat and, on at least one occasion, helped him get back on the mat after he was observed laying on the floor of the cell;

- When they realized Mr. Ford was not improving as he would have, Defendants, also on two separate occasions, notified their supervisor, who then authorized Mr. Ford's transport to the hospital;

- Upon arrival at the hospital, the treating physician's initial observation was that Mr. Ford was suffering from liver disease and hyperammonemia; and

- It was not until after a CAT scan was performed that the doctors discovered an internal hemorrhage.

[ECF No. 53 at pp.5–7.]  According to Defendants, these facts are in line with Sixth Circuit and Eleventh Circuit cases, both of which affirmed grants of summary judgment in favor of the defendants in those cases.  *See Shaver v. Brimfield*, 628 F. App'x 378 (6th Cir. 2015);[2] *Walker v. Huntsville*, Ala., 310 F. App'x 335 (11th Cir. 2009).  The court addresses the facts in the record as they relate to each Defendant.

**A. Defendant Reitzel.**

Starting with Defendant Reitzel, Defendants' recitation of the facts fails to include those undisputed facts that are favorable to Plaintiff.  Defendants omit the fact that Defendant Reitzel was present when Mr. Ford was booked into the facility, and that Defendant Reitzel admits that Mr. Ford appeared "confused" at that time.  [ECF No. 52 at pp.2–3.]  Defendant Reitzel observed Mr. Ford's inability to walk upright and noticed that "he was leaning to his right side."  [ECF No.

---

[2] The undersigned finds that *Shaver* is distinguishable from the instant case in one important respect: There, the officers "reasonably responded" to the plaintiff's "serious medical needs by contacting the nursing staff at the jail for medical assistance."  *Shaver v. Brimfield*, 628 F. App'x 378, 383 (6th Cir. 2015).  No such evidence exists in this case.

42-2 at ¶ 65.] Also at the time of booking, another officer and Defendant Reitzel's supervisor, Kathleen Swanson, "observed that Ford was having 'some difficulty' in answering the booking questions, was having difficulty walking, and that his skin was 'gray in color.'" *Id.* at p.2. Moreover, Mr. Ford told Defendant Reitzel during his booking that he suffered from cirrhosis of the liver—meaning she was on notice of Mr. Ford's contention that he suffered from an underlying condition. *Id.* pp.2–3; [*see also* ECF No. 42-2 at ¶ 42]. Thus, the undersigned must decide whether these facts, or any others in the record, give rise to a genuine dispute over the subjective elements of deliberate indifference.

The facts described above, while evidencing that Defendant Reitzel was aware of Mr. Ford's contention that he had cirrhosis, do not evidence her subjective recognition of a risk of substantial harm from the alleged cirrhosis. Accordingly, the court is unable to conclude that a reasonable juror could find that Defendant Reitzel knew Mr. Ford was at a risk of serious harm at the time of booking.[3] *See Petersen v. Midgett*, 140 F. Supp. 3d 490 (E.D.N.C. 2015) (concluding the plaintiff

---

[3] The record is limited in terms of Defendant Reitzel's involvement with or observations of Mr. Ford post-booking. It was Officer Kathleen Swanson—not a party to this case—who "observed Ford sitting and lying down on his mat in the cell and also observed several of the officers speaking with him off and on." [ECF No. 42-2 at ¶ 66.] The Report indicates that it was Defendant Reitzel who informs Officer Kathleen Swanson that Mr. Ford had not improved over the six-hour period in which he was in the observation cell. [ECF No. 52 at p.3.] The record, however, indicates that Defendant Taylor observed Mr. Ford on several occasions and informed Officer Kathleen Swanson that he was not approving—at 2:36 PM. [ECF No. 42-2 at ¶ 134 ("At 2:36 P.M., Taylor again checks on Ford."); ¶¶ 133–34 ("At 2:38 P.M., Swanson stops by and she is checking on Ford. At 2:41 P.M., Swanson goes into the cell and[sic] an attempt to get Ford off his back and onto the mat. Taylor enters into the sale[sic] and they get into a seated position at which time Detention Officer Johnson assists Taylor in getting Ford to lie down on the mat."); ¶ 136 ("At 2:52 P.M., medics from the Myrtle Beach fire department or[sic] seen arriving at Ford's jail cell.").] The only evidence as to Defendant Reitzel post-booking is one note that she informed Officer Kathleen Swanson of the lack of change in Mr. Ford's condition at "1445 hours." [*See* ECF No. 42-2 at ¶ 67 ("At approximately 1445 hours, DO Reitzel informed Swanson that Ford was not doing any better in regard to his intoxication symptoms, that he did not seem to be sobering up."); *see also* ECF No. 46-1 at pp.52–53 ("When Inmate Ford did not appear to be sobering up[,] I informed Supervisor Swanson.").]

7

did not create a genuine dispute of material fact concerning deliberate indifference where there was no evidence that the officer "had actual knowledge of an objectively serious condition"). Further, the court is unable to conclude that there is any evidence—let alone sufficient evidence to survive summary judgment—that Defendant Reitzel subjectively recognized that her actions (booking Mr. Ford and placing him in an observation cell without seeking medical treatment) were inappropriate in light of the risk.  The court agrees with Defendants that the evidence—as it relates to Defendant Reitzel—is more akin to that presented in *Walker v. Huntsville, Ala.*, 310 F. App'x 335 (11th Cir. 2009).

In *Walker*, the plaintiff was booked for driving under the influence.  At booking, she was deemed too intoxicated for medical examination.  After an overnight stay, she was later given "basic medical screening, which consisted of a series of questions designed to elicit the subject's medical condition."[4]  310 F. App'x at 337.  She ultimately remained in custody for over 22 hours, was later released, and then taken to the hospital by her son.  *Id.*  A CT scan then revealed a bleeding aneurysm in her brain.  *Id.*  The district court concluded that even if the plaintiff met the "objectively serious medical need" element, she did not demonstrate deliberate indifference.  *Id.* at 338.  The Eleventh Circuit agreed, concluding that plaintiff failed to produce any evidence that the officers "knew she had a serious medical condition"—the bleeding aneurysm.  *Id.* at 339.  The plaintiff's symptoms there, much like the symptoms exhibited by Mr. Ford here, "were easily confused with the effects of drugs or alcohol."  *Id.*

This court is compelled to come to the same conclusion in this case: "[E]ven if it was negligence of [Defendant Reitzel] not to provide [Mr. Ford] with more intensive medical care [at

---

[4] This process appears similar to the initial screening performed by Defendant Reitzel in this case; the one main distinction being that Mr. Ford received an initial medical examination by EMTs before he was transferred to booking.

8

booking], mistakenly failing to identify a brain aneurysm is not *deliberate* indifference." *Id.* Plaintiff here fails to put forth any evidence to suggest that Defendant Reitzel should have been able to "distinguish [Mr. Ford's] symptoms from some form of intoxication or to recognize them as requiring immediate medical attention." *Id.* For these reasons, the court declines to adopt the Report as to Defendant Reitzel, and it concludes that Defendant Reitzel is entitled to summary judgment on this claim.

**B. Defendant Taylor.**

Turning to the evidence related to Defendant Taylor, the court agrees with the Report that a genuine dispute of material fact exists regarding whether Defendant Taylor was deliberately indifferent to Mr. Ford's serious medical needs.

Defendant Taylor was on duty while Mr. Ford was in the cell, and she checked on him various times throughout the day.[5] [ECF No. 42-2 at ¶¶ 126–132, 134.] During one check, she saw Mr. Ford fall backwards from a kneeling position and hit his head on the floor. *Id.* at ¶¶ 69–71, 79. She asked if he wanted medical attention "at least four" times and "he kept denying it saying he was okay." *Id.* at ¶ 72. When asked if Mr. Ford got up to lay on his mat after he fell and hit his head, Defendant Taylor said that he did not. *Id.* at ¶ 75. Further, Defendant Taylor noted that Mr. Ford was making "nonsensical" statements. [ECF No. 52 at p.3.] Defendant Taylor informed her supervisor that Mr. Ford fell, but did not otherwise seek medical assistance or notify any medical staff of the fall.

On the other instances during which Defendant Taylor checked on Mr. Ford, he was lying on the floor, at least partially off of the mat and unable to get to his feet. *Id.* at ¶¶ 126–32. The video footage shows Defendant Taylor checking on Mr. Ford at 1:27 p.m., 1:53 p.m., and 2:36 p.m. *Id.*

---

[5] The video footage starts at 1:27 p.m. There is no available video evidence prior to that time.

9

at ¶¶ 127, 129, 132.  During a final check at 2:41 p.m., Defendant Taylor and Officer Kathleen Swanson assist Mr. Ford in getting off of his back and onto his mat.  *Id.* at ¶ 134.  The medics arrive at Mr. Ford's cell at 2:52 p.m., and Defendant Taylor opens the cell for the medics.  *Id.* at ¶ 137; [*see also* ECF No. 46-1 at p.56.].

Given the foregoing facts in the record, the court agrees with the Report that a reasonable juror could conclude that Defendant Taylor was "aware of facts from which the inference could be drawn that a substantial risk of harm exist[ed] and [she] . . . [drew] the inference."  [ECF No. 52 p.6 (quoting *Farmer*, 511 U.S. at 837).]  Each time Defendant Taylor checked on Mr. Ford, he was either laying on the floor, unable to get on his mat unassisted, or attempting to stand and falling.  Further, during this time, he was making "nonsensical" comments.  After observing Mr. Ford fall and hit his head, Defendant Taylor admittedly asked him several times if he needed medical assistance.  She also asked her supervisor if there was anything else she needed to do, but was told there "was nothing else to do since inmate Ford had refused any medical help."  [ECF No. 46-1 at p.56.]  A reasonable juror could infer that Defendant Taylor's asking the question more than once and asking for clarification from her supervisor suggests that she knew that Mr. Ford was at a "substantial risk of harm" and that she knew that taking further action would be appropriate.  Summary judgment as to Defendant Taylor is denied.

**II.   Objection 3: Qualified Immunity.**

The final issue to address as to the First Cause of Action asserted against Defendant Taylor is that of qualified immunity.  The Report concluded that "[i]t was clearly established at the time of this incident that law enforcement officers violate an individual's constitutional rights if they know of and disregard an excessive risk to the inmate's health or safety."  [ECF No. 52 at p.10.] Defendants object, arguing the Report's conclusion paints too broad a stroke.  [ECF No. 53 at

pp.11–14.] According to Defendants, the Report should have asked whether "existing precedent placed the alleged inappropriateness of Defendant Reitzel and Taylor's actions beyond debate." *Id.* at p.12. Plaintiff counters that "the 'right in question' is defined as 'the right of prisoners to receive adequate medical care and to be free from the officials' deliberate indifference to their known medical needs.'" [ECF No. 56 at p.8 (citing *Scinto v. Stansberry*, 841 F.3d 219, 236 (4th Cir. 2016).] The court agrees with Plaintiff and the Report.

"Under the doctrine of qualified immunity, government officials performing discretionary functions are generally shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Orange v. Fielding*, 517 F. Supp. 2d 776, 791 (D.S.C. 2007). "The qualified immunity inquiry has two steps." *Campbell*, 2020 WL 5014880, at *4. First, the plaintiff must "make out a violation of a constitutional right." *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). Second, the right must be one that is "clearly established" at the time of the purported violation. *Id*.

In this case, the court concludes that "summary judgment on qualified immunity grounds is improper as long as there remains any material factual dispute regarding the actual conduct of" Defendant Taylor. *Vathekan v. Prince George's Cty.*, 154 F.3d 173, 180 (4th Cir. 1998) (citation omitted). Because such material actual disputes exist, the court denies Defendants' motion for summary judgment on the basis of qualified immunity.

### III. Objections Related to Third and Fourth Causes of Action: Proximate Cause.

In addition to the deliberate indifference claim, Plaintiff also seeks to recover from the municipal defendants for negligence/gross negligence/survival and wrongful death in the Third and Fourth Causes of Action. The Report recommends that this court deny summary judgment on

11

both claims. [ECF No. 52 at pp.13–17.] As to the Third Cause of Action, the Report concluded that there was a genuine dispute of material fact over whether Defendants Reitzel and Taylor's actions were grossly negligent.[6] With respect to the Fourth Cause of Action, the Report concluded that there was more than one reasonable inference to be drawn as to the proximate cause of Mr. Ford's death. *Id.* at p.17. Defendants object, arguing that the Magistrate Judge improperly construed the lack of expert testimony in favor of Plaintiff on the issue of proximate cause as a credibility determination. [ECF No. 53 at p.15.]

Plaintiff's Fourth Cause of Action is one for wrongful death under South Carolina law. There is no dispute that this claim is properly asserted against the municipal defendants under the South Carolina Tort Claims Act. At summary judgment, Defendants argued that Plaintiff lacked any evidence of causation, *i.e.*, that the actions of Defendant Reitzel and Defendant Taylor proximately caused the death of Mr. Ford. Defendants ask the court to apply the "most probably test" to determine proximate cause. [ECF No. 42-1 at p.19.] Neither the Report nor this court finds that the "most probably test" applies here.[7] Instead, the court finds that it must apply traditional proximate cause principles in analyzing whether Plaintiff can recover for wrongful death.

---

[6] Defendants moved for summary judgment on the Third Cause of Action on two grounds: (1) lack of evidence of gross negligence and (2) no evidence that Mr. Ford experienced any pain or suffering while in custody. [ECF No. 42-1 at pp.17–18.] While Defendants did not argue proximate cause on summary judgment in relation to the survival claim, the court is compelled to conclude that its analysis on proximate cause as to the wrongful death claim applies with equal force to the survival claim. As a result, summary judgment in favor of Defendants is appropriate on the survival claim. *See, e.g., McKnight v. S.C Dep't of Corrs.*, 684 S.E.2d 566, 572 (S.C. Ct. App. 2009) ("The trial court's findings on proximate cause and duty apply to the survival action as well. . . . Accordingly, the trial court properly granted summary judgment on the survival cause of action.").

[7] The "most probably test" applies in medical malpractice cases. *See Jones v. Owings*, 456 S.E.2d 371 (S.C. 1995) (declining to adopt the "loss of chance" doctrine and holding "the trial judge properly held Jones did not establish Owings' alleged negligence most probably caused Decedent's death"); *Burroughs v. Worsham*, 574 S.E.2d 215, 222 (S.C. Ct. App. 2002) (concluding trial judge properly charged the jury with appropriate standard of proof that "the expert must state

"In actions for wrongful death, as in the case of actions for personal injuries generally, it is essential to a recovery of damages that the wrongful act or default of the defendant shall have been the proximate cause of the death resulting therefrom." *Scott v. Greenville Pharmacy*, 48 S.E.2d 324, 326 (S.C. 1948); *see also* S.C. Code Ann. § 15-51-10 (stating that a civil action for wrongful death requires that "the death of a person [was] caused by the wrongful act, neglect or default of another"). "Ordinarily, establishing proximate cause requires proof of (1) causation-in-fact, and (2) legal cause, which is provide by establishing foreseeability." *Wickersham v. Ford Motor Co.*, 738 F. App'x 127, 131 (4th Cir. 2018) (citing *Baggerly v. CSX Transp., Inc.*, 635 S.E.2d 97, 101 (S.C. 2006)).

"Causation in fact is proved by establishing the plaintiff's injury would not have occurred 'but for' the defendant's negligence." *Hurd v. Williamsburg Cty.*, 611 S.E.2d 488, 492 (S.C. 2005) (citing *Oliver v. S.C. Dep't of Highways & Pub. Transp.*, 422 S.E.2d 128, 130 (S.C. 1992)). As to legal cause, "foreseeability is considered 'the touchstone . . . ,' and it is determined by looking to the natural and probable consequences of the defendant's act or omission." *Wickersham v. Ford Motor Co.*, No. 2018-001124, 2019 WL 3311057, at *3 (S.C. July 24, 2019*), reh'g granted* (May 7, 2020) (citing *Baggerly*, 635 S.E.2d at 101). "In most cases, foreseeability ends up being addressed as a question of fact for the jury." *Id.* However, "[i]n the first instance, [] legal cause is just what its name suggests—a question of law." *Id.* When the evidence is capable of only one inference, legal cause is a question of law for the court. *See id.*

The alleged wrongful act in this case is the delay in getting Mr. Ford medical treatment. Thus, the questions related to proximate cause are: (1) would Mr. Ford's death have occurred "but for"

---

with reasonable certainty that in his professional opinion the injuries most probably resulted, or the death most probably resulted from the alleged negligence of the defendant").

13

the delay in treatment and (2) was Mr. Ford's death the natural and probable consequence of the delay in treatment? If there is a genuine dispute of material fact as to either question, Defendants' motion must be denied.

In this case, there is no dispute that Mr. Ford "died as the result of a left frontal stroke with associated intracranial hemorrhage." [ECF No. 42-8 at p.4.] Neither Dr. Cheatle nor Dr. Novinger were able to testify to the cause of the stroke. [*See* ECF No. 42-7 at 30:3–5; ECF No. 42-3 at 23:5–8 (Q. Do you know what the cause of the stroke was? A. We do not know the cause of the stroke.").] Dr. Cheatle testified that a "stroke like this" could "come from a blow to the head." [ECF No. 42-3 at 23:23–24:1.] More specifically, Dr. Cheatle testified that "[a]n intracerebral hemorrhage could happen from a trauma[.]" *Id.* Dr. Novinger similarly testified that while he had "not diagnosed a stroke that's caused by a blow to the head," he had "diagnosed subarachnoid hemorrhages or intracranial hemorrhages that were caused by blows." [ECF No. 42-7 at 32:16–21.] Additionally, both Dr. Cheatle and Dr. Novinger agreed that the proper course of treatment in this situation would be surgical intervention to relieve the pressure of the hemorrhage. [ECF No. 42-3 at 18:9–9; ECF No. 42-7 at 21:13–21.] And, again, both doctors agreed that surgical intervention was not safe because Mr. Ford suffered heptic cirrhosis, which was the cause of his thrombocytopenia. [ECF No. 42-3 at 25:14–17, 40:11–13; ECF No. 42-7 at 37:11–25.] In plain terms, Mr. Ford suffered from liver disease, "as severe as it could get," which caused his platelet count to be too low to safely perform surgery. [ECF No. 42-3 at 41:7–9.] Dr. Cheatle testified affirmatively, however, that the hemorrhage would not have contributed to his low platelet count. *Id.* at 29:7–12.

In an effort to increase Mr. Ford's platelet count and perform surgery, Dr. Cheatle gave Mr. Ford platelet transfusions. *Id.* at 42:5–43:1. Ultimately, Mr. Ford's platelet counts did not increase

14

enough to allow Dr. Cheatle to perform the surgery, and Mr. Ford died.  Both Dr. Cheatle and Dr. Novinger were asked whether additional time would have changed the result, *i.e.*, if Mr. Ford was brought in earlier and given platelet transfusions earlier, would he have died?  It is at this point that the opinions of the two doctors parted ways.

Dr. Novinger answered the question in the negative:  "Q. If [Mr. Ford] had more time, you think he could have got his platelets up?  A. I think in my reasonable medical opinion, you know, reasonable degree of certainty, no, unfortunately."  [ECF No. 42-7 at 38:7–13.]  He stated that the "[s]ix hours would have made unfortunately no difference" and "he could have had ten days of treatment and it wouldn't have mattered in this individual."  *Id.* at 39:22–40:24.  In response to the same question, Dr. Cheatle testified that "the problem was his heart started to fail at that time," so he didn't "know if more time would have changed that because [he] couldn't transfuse him with more platelets because he was in heart failure."  [ECF No. 42-3 at 56:20–57:2.]  Further, when asked if he wished he "could have had more time to treat this patient," Dr. Cheatle testified he didn't "know the answer to that," that he didn't "know if things would have changed or not."  *Id.* at 57:25–58:6; *see also id.* at 45:20–25 ("[I]f I understand this right, is[sic] did a six-hour delay cause him to die?  Q. Yes.  A. I don't know.  I don't know the answer to that, I'm sorry.  I don't know.").

Defendants argue that they are entitled to summary judgment because Dr. Cheatle's testimony that he "doesn't know" if more time would have impacted the outcome is insufficient to create a genuine dispute of material fact on the element of causation.  Plaintiff, in response, argues that Dr. Cheatle's additional testimony—that in "a neurological emergency," "the longer the time[,] the wors[e] the outcome"—is sufficient to create a genuine dispute for trial.  *Id.* at 32:9–33:2; *see also id.* at 20:13–16 ("Q. Then the drain is the neurological surgeon's therapeutic intervention?  A. For

15

this case, yes. If I didn't think it would change an outcome, I wouldn't have offered it."); 45:12 ("So, it sounds like he was worse when he was seen by us."). On summary judgment, this court must decide whether Dr. Cheatle's answer that he "doesn't know" if the six-hour delay caused Mr. Ford's death, combined with his general testimony that in these cases, "the longer the time, the worse the outcome," is sufficient to give rise to a genuine dispute on proximate cause. The court finds that it does not. This is one of those "rare or exceptional cases" in which "the question of proximate cause [can] be decided as a matter of law." *Hurd v. Williamsburg Cty.*, 579 S.E.2d 136, 145 (S.C. Ct. App. 2003).

The court agrees with Plaintiff that Dr. Cheatle's general testimony, that in these types of cases "the longer the time, the worse the outcome," serves as some evidence for purposes of proximate cause. It serves as evidence of legal cause. Based on Dr. Cheatle's testimony, a jury could conclude that a foreseeable result of delay in neurological cases is death. This same evidence does not serve as evidence of causation in fact, however.

As to causation in fact, Dr. Novinger affirmatively testified that the delay in treatment had no impact on the outcome in this case. To survive summary judgment then, Plaintiff was required to present some evidence that "but for" the six-hour delay in treatment, Mr. Ford would not have died. He failed to do so. Dr. Cheatle's testimony on the causation-in-fact element was, "I don't know," meaning he could not say one way or the other that absent the six-hour delay, Mr. Ford would have survived. Thus, comparing the testimony, this is not a situation in which "there is a fair difference of opinion regarding whose act proximately caused the injury." *Id.* Rather, Plaintiff failed to present *any* evidence to indicate that the Defendants' delay was the "but for" cause of Mr. Ford's death. As a result, there is no evidence at all that even if Mr. Ford was treated six hours earlier, he would not have died. Consequently, there is no jury issue on the question of causation

in fact. *See Thomas v. S.C. Dep't of Highways & Pub. Transp.*, 465 S.E.2d 578, 402 (S.C. Ct. App. 1995) (affirming directed verdict where plaintiff "failed to present any evidence of a connection between the Department's failure to enforce" a statute and the negligence that led to the plaintiff's injuries).

In accordance with the foregoing, the court declines to adopt the Report's recommendations as to the Third and Fourth Causes of Action. Defendants' motion for summary judgment on both claims is granted.

**IV. No Objection: Second Cause of Action and Dismissal.**

Finally, Plaintiff does not object to the Report's recommendation that this court grant summary judgment in favor of Defendants on the Second Cause of Action. Accordingly, without objection, the court reviews the Report for clear error; finding none, the court adopts the Report and grants summary judgment to Defendants on the Second Cause of Action.

## CONCLUSION

Having reviewed the Report, the objections, and the record before this court, and for the reasons set forth above, the court adopts the Report in part and declines the Report in part [ECF No. 52]. It is the judgment of this court that Defendants' motion for summary judgment [ECF No. 42] is **GRANTED in part and DENIED in part**. Summary judgment is **GRANTED** in favor of Defendant Reitzel and **DENIED** to Defendant Taylor on Plaintiff's First Cause of Action. Further, summary judgment is **GRANTED** on Plaintiff's Second, Third, and Fourth Causes of Action, and Defendant Gall is **DISMISSED**. Defendants Alvarado and Eveges are also **DISMISSED**.

The parties are further **ORDERED** to, within fourteen (14) days of the date of this Order, submit a joint scheduling order to include a mediation deadline, all pre-trial deadlines, and a date-certain trial to begin on February 22, 2021.

**IT IS SO ORDERED.**

/s/ Sherri A. Lydon
United States District Judge

September 8, 2020
Florence, South Carolina